No. 120,209

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

SERGIO ANGEL ARRIZABALAGA,
*Appellee*.

SYLLABUS BY THE COURT

1.

When reviewing a district court's decision on a motion to suppress, we apply a bifurcated standard. First, we review the district court's factual findings to determine whether those findings are supported by substantial competent evidence. Second, we then review the district court's ultimate legal conclusion drawn from the facts de novo.

2.

If the parties do not dispute the facts of the case, the question of suppression becomes exclusively a matter of law over which the court exercises unlimited review.

3.

Whether the district court abused its discretion by applying an incorrect legal standard is a question of law.

4.

The Fourth Amendment of the United States Constitution and § 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. A routine traffic stop is a seizure under the Fourth Amendment, so it is subject to the constitutional

1

requirement of reasonableness. To satisfy the reasonableness requirement, the scope and duration of a traffic stop and the circumstances that rendered its initiation must be strictly tied.

5.

Traffic stops must be minimally intrusive and diligently pursued, and a law enforcement officer's actions must be reasonably related in scope to the circumstances that justified the initial interference. During a routine traffic stop, an officer may: (1) request the motorist's driver's license and vehicle registration, (2) conduct a computer check, (3) issue a citation, and (4) take steps reasonably necessary to protect the officer's safety. The stop can last only as long as necessary to complete those tasks, and the tasks must be diligently pursued.

6.

When a driver produces a valid license and proof that he or she may operate the vehicle, the driver must be allowed to proceed without being subject to further delay for additional questioning. To justify a temporary detention for further questioning or investigation, the officer must have reasonable and articulable suspicion of illegal transactions in drugs or another serious crime.

7.

Reasonable suspicion requires something more than just a hunch, law enforcement must be able to find a particularized and objective basis for believing the person stopped is engaged in criminal activity.

8.

Without reasonable suspicion to justify the extension of a completed stop, any further delay is unreasonable.

9.

The State has the burden to demonstrate that a seizure following an officer's determination that reasonable suspicion existed was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. Traffic stops have limitations. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

10.

To determine if officers have complied with limits, courts must take into account whether the police diligently pursued their investigation. Specifically, courts should examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

11.

Law enforcement must act diligently and detain only temporarily for no longer than necessary to effectuate the purpose of the stop, even if law enforcement has reasonable suspicion that the person is engaging in illegal activity.

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed July 26, 2019. Affirmed.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Julie McKenna*, of McKenna Law Office, P.A., of Salina, for appellee.

Before STANDRIDGE, P.J., GARDNER, J., and WALKER, S.J.

WALKER, J.: The State appeals the district court's decision to grant Sergio Angel Arrizabalaga's motion to suppress evidence on the grounds that a state highway patrol

3

trooper who stopped Arrizabalaga while he was driving on I-70 did not diligently pursue the purpose of the stop and that the stop was excessive in duration. The State argues that the district court abused its discretion by applying incorrect standards of law and that the district court erred when finding the trooper did not act diligently. But our review of the district court's analysis shows that the district court applied correct standards of law and thus did not abuse its discretion. Additionally, we find the court did not err when granting the motion to suppress because the trooper who stopped Arrizabalaga did not act diligently and did not reasonably pursue the purpose of the stop after he gained reasonable suspicion that Arrizabalaga was involved in drug activity. Thus we affirm the district court's decision.

FACTS

*The stop and search of Arrizabalaga's vehicle*

Around 9:45 p.m. on September 5, 2017, Kansas Highway Patrol Trooper Kyle Seiler initiated a traffic stop of Arrizabalaga's vehicle for following a tractor trailer too closely as he drove along I-70 near Salina. At the suppression hearing held later in this case, Seiler testified that he initially saw Arrizabalaga's van was travelling slower than most traffic on I-70, around 67 miles per hour, so he started following it. While following, Seiler continued to observe the van and initiated the traffic stop when Seiler determined that Arrizabalaga was following a tractor trailer too closely. Seiler looked up the van's tag number when he initiated the stop. Seiler testified that Arrizabalaga slowed the van significantly in the driving lane before pulling off onto the shoulder of I-70, which seemed odd to him based on his experience in conducting traffic stops.

Seiler approached the van, shined his flashlight on the vehicle, and observed that the van was full of stacked cardboard boxes, large black bags, and a suitcase. As Seiler initiated contact with Arrizabalaga and the passenger, Seiler noticed a radar detector on

4

the windshield, which he thought was odd because Arrizabalaga had not been speeding. Seiler also noticed a strong odor of "either cologne or air freshener, some sort of deodorizer" coming from inside the van. While at the van, Seiler asked for Arrizabalaga's driver's license and rental papers and inquired about Arrizabalaga's travel plans. Arrizabalaga told Seiler he was going to St. Louis to see family and friends.

Seiler requested Arrizabalaga to accompany him to his patrol car, and Arrizabalaga did so. Once they were in the patrol car, Seiler requested a driver's license check through dispatch and a criminal history check. While waiting on the results of these checks, Seiler asked Arrizabalaga more about his travel plans. Arrizabalaga told Seiler he was from Broomfield, Colorado, which Arrizabalaga said was about 20 minutes from where he rented the van in Denver. Seiler asked about the cargo in the van, which Arrizabalaga told him was for a surprise birthday party for the passenger in a few days.

Arrizabalaga continued to tell Seiler about his travel plans, providing that he and his passenger had stopped at an IHOP restaurant in Salina and wanted to keep driving until they could find a nice hotel like a Holiday Inn. Seiler testified that this struck him as odd because there is a Holiday Inn right next to the IHOP in Salina. Seiler then asked Arrizabalaga why the one-way rental was to be dropped off in Tallahassee, Florida, rather than their destination of St. Louis. Seiler asked Arrizabalaga if he was going to Florida, and he said no. Arrizabalaga told Seiler that he had two weeks off of work and was going to travel after stopping in St. Louis. He stated that the passenger was unaware of his travel plans and that Arrizabalaga was planning to fly back to Colorado.

The district court found that about eight and a half minutes elapsed until dispatch confirmed Arrizabalaga's driver's license was valid and provided his criminal history. Seiler printed off a warning ticket and told Arrizabalaga that was all he had for him. Arrizabalaga started to get out of the car, and Seiler asked him if he would answer more questions. Arrizabalaga consented, and Seiler began asking him about his criminal

5

history. Arrizabalaga told Seiler he had been issued a citation for marijuana, but he had never been arrested, which was inconsistent with the information the dispatch had provided. Dispatch provided that Arrizabalaga had been charged with producing marijuana and a felony related to a stolen vehicle. Seiler then asked Arrizabalaga if he could search his van, and Arrizabalaga consented.

After he gave consent, Arrizabalaga and Seiler returned to Arrizabalaga's van, and Seiler asked the passenger to exit the van. At this time, Seiler told Arrizabalaga that he had reasonable suspicion but not probable cause to search the van. Arrizabalaga asked Seiler if he had a search warrant, and Seiler responded that Arrizabalaga had consented. Seiler told Arrizabalaga and his passenger that he was looking for large amounts of drugs and any personal use amounts would "go into the ditch." Arrizabalaga then revoked his consent to search the van.

After Arrizabalaga revoked consent, Seiler informed Arrizabalaga that he was calling for a drug dog, and if no dog was available then they would be free to leave. Seiler took the van keys from Arrizabalaga and called dispatch to find a dog. Dispatch advised there was no dog available, but a few minutes later Kansas Highway Patrol Lieutenant Scott Walker informed Seiler he had a dog and would come to the scene. Walker arrived approximately 24 minutes later. Walker's dog alerted within three minutes of Walker's arrival. A search of the van revealed 112 packages containing approximately 111.5 pounds of marijuana. Arrizabalaga was arrested, and the State charged him with one count each of possession with intent to distribute marijuana, possession of drug paraphernalia, and no drug tax stamp.

*The first motion to suppress*

Arrizabalaga filed his first motion to suppress on July 16, 2018, requesting that the court "suppress[] the items seized by law enforcement and any statements made by

6

[Arrizabalaga] to law enforcement as the result of an unlawful detention and search and seizure." In this motion, Arrizabalaga argued that Seiler did not have probable cause to stop the van and did not have reasonable suspicion to detain Arrizabalaga. The district court held the first motion to suppress hearing a few days later and made an oral ruling at a separate hearing. The district court found that Seiler had reasonable suspicion for the initial traffic stop and that Seiler's questions about travel plans while processing the traffic infraction were appropriate and did not measurably extend the length of the stop. Regarding the voluntary exchange after the completion of the initial stop, the district court found that Arrizabalaga consented to additional questions and that the encounter became voluntary until he withdrew consent to search the van.

The district court provided a factual analysis of the totality of the circumstances for finding reasonable suspicion, including consideration of the cargo in the van, the odor of cologne or air freshener, and the rental agreement. The district court stated:

> "If this was based solely on the initial observations made by Trooper Seiler, the Court would find this to be a very close case. Trooper Seiler did not see any air fresheners in the van and did not ask either occupant about the odor. And traveling to Missouri would not be a significant variation from traveling to Tallahassee from Denver using I-70.
> "However, as noted the recent Kansas Supreme Court decisions, Seiler could ask additional travel questions in the course of pursuing the mission of the traffic stop without extending the length of the detention. A noticeable disconnect between the driver's explanation and the rental documents would warrant additional inquiry. That is what occurred in this case."

The district court detailed the further inquiry the trooper made. Then, the district court provided:

> "As noted in a Tenth Circuit Court of Appeals case, quoted in the [*State v.*] *Schooler*[, 308 Kan. 333, 419 P.3d 1164 (2018),] decision by the Kansas Supreme Court,

7

lies, evasions, or inconsistencies about any subject while being detained may contribute to reasonable suspicion.

"This Court finds defendant's answers regarding his travel plans to be more than unusual or strange. The travel plan answers were inconsistent with the four-day [rental], thus they were a factor supporting reasonable suspicion.

"Then, after the encounter became voluntary, the defendant gave answers inconsistent with the criminal history information from dispatch. As stated in *Schooler,* criminal history alone cannot support reasonable suspicion, but in conjunction with other factors, criminal history contributes powerfully to reasonable suspicious calculus. Moreover, when the individual lies about having a criminal history, the inference of wrongdoing is all the more powerful.

"The Court finds, based on the totality of the circumstances, when the defendant withdrew his consent to search the van, there was objectively reasonable suspicion of other activities to extend the detention for the dog sniff. The motion to suppress is denied."

*The second motion to suppress*

About one month after the initial motion to suppress was denied, Arrizabalaga filed a second motion to suppress arguing that the length of the detention for the drug dog's arrival was too long and that his statements made to Seiler after searching the van were not voluntary.

At the second motion to suppress hearing, the State contended that officers could do one of two things when using a drug dog during a traffic stop. In the absence of reasonable suspicion, an officer could run the dog during the traffic stop if it did not extend the original purpose of the stop in any measurable way. But if there was reasonable suspicion, then the State argued that an officer could detain Arrizabalaga long enough to bring in a drug dog. The State took the position that the reasonable suspicion framework of how long an officer can detain for a drug dog has been "sort of foreclosed under *Rodriguez* [*v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492

8

(2015)], when [the United States Supreme Court] reaffirmed that you can't hold for any length of time, whether reasonable or not, if you don't have that reasonable suspicion." The State maintained that because the court had already found Seiler had reasonable suspicion of drug activity, "the length of detention, frankly, doesn't matter."

The district court took the arguments under advisement, and five days later the district court granted the second motion to dismiss and suppressed the results of the search and the statements made by Arrizabalaga after his arrest as fruit of the poisonous tree. The district court reviewed the State's interpretation of *Rodriguez* and disagreed "completely" with the State's position. During the oral pronouncement of the holding, the district court stated that relevant Kansas caselaw established a standard of diligence and reasonableness by law enforcement at all times, regardless of reasonable suspicion. The district court held:

> "In this case Mr. Arrizabalaga and his passenger were held for approximately 24 minutes and on the tape there is nothing that occurs between—dealing with this case between Trooper Seiler's call in, to determine if a dog is available, and Trooper Walker's arrival with his dog 24 minutes later.
> "The Court is going to find that that is not diligently and reasonably pursuing the purpose of the stop, that the stop was excessive in duration, and that, therefore, the results of that search should be suppressed, as requested by the defense."

The State timely filed an interlocutory appeal of this ruling.

ANALYSIS

When reviewing a district court's decision on a motion to suppress, we apply a bifurcated standard. First, we review the district court's factual findings to determine whether those findings are supported by substantial competent evidence. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014). Second, we then review the district

9

court's ultimate legal conclusion drawn from the facts de novo. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

If the parties do not dispute the facts of the case, the question of suppression becomes exclusively a matter of law over which the court exercises unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014). Because the parties do not dispute the material facts of this case, our review of the district court's findings will be de novo. Whether the district court abused its discretion by applying an incorrect legal standard is a question of law. *State v. Collins*, 303 Kan. 472, 477, 362 P.3d 1098 (2015).

*The State's argument on abuse of discretion*

The State argues the district court abused its discretion because it applied an incorrect legal standard by misinterpreting caselaw when it made oral findings from the bench. We do not need to decide this argument since we review the district court's legal determinations de novo. Nevertheless, our own analysis as to whether the district court's legal determinations were correct convinces us that the district court did not apply incorrect legal standards.

*The requirement for diligence and reasonableness for detention by law enforcement*

The Fourth Amendment of the United States Constitution and § 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). A routine traffic stop is a seizure under the Fourth Amendment, so it is subject to the constitutional requirement of reasonableness. *State v. Smith*, 286 Kan. 402, 406, 184 P.3d 890 (2008). To satisfy the reasonableness requirement, the scope and duration of a traffic stop and the circumstances that rendered its initiation must be strictly tied. *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007).

10

Traffic stops must be minimally intrusive and diligently pursued, and a law enforcement officer's actions must be reasonably related in scope to the circumstances that justified the initial interference. See *United States v. Sharpe*, 470 U.S. 675, 682, 686-87, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). During a routine traffic stop, an officer may: (1) request the motorist's driver's license and vehicle registration, (2) conduct a computer check, (3) issue a citation, and (4) take steps reasonably necessary to protect the officer's safety. The stop can last only as long as necessary to complete those tasks, and the tasks must be diligently pursued. *Thompson*, 284 Kan. at 774.

When a driver produces a valid license and proof that he or she may operate the vehicle, the driver must be allowed to proceed without being subject to further delay for additional questioning. To justify a temporary detention for further questioning or investigation, the officer must have reasonable and articulable suspicion of illegal transactions in drugs or another serious crime. *State v. Anderson*, 281 Kan. 896, 902, 136 P.3d 406 (2006). Reasonable suspicion requires something more than just a hunch, law enforcement must be able to find a particularized and objective basis for believing the person stopped is engaged in criminal activity. *State v. DeMarco*, 263 Kan. 727, 734-35, 952 P.2d 1276 (1998). Without reasonable suspicion to justify the extension of a completed stop, any further delay is unreasonable. See *Rodriguez*, 135 S. Ct. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he [or she] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

*The first motion to suppress*

This appeal is different than most heard on this type of motion because the district court initially found at the first suppression hearing that Seiler had reasonable suspicion to further detain Arrizabalaga and ruled in favor of the State, denying the motion to suppress at which Arrizabalaga had argued only that the State illegally detained him

11

because it lacked reasonable suspicion of illegal drug activity. This decision was not appealable. K.S.A. 2018 Supp. 22-3608. Thus, we need not and cannot question whether reasonable suspicion existed, and in deciding the second suppression issue we must rely on the district court's finding on the first motion that reasonable suspicion did exist. Instead, we must focus on the narrow issue litigated in the second motion to suppress—whether the trooper was not diligent enough in verifying or dispelling his suspicions after finding reasonable suspicion. See *Sharpe*, 470 U.S. at 685.

*The second motion to suppress*

The State has the burden to demonstrate that a seizure following an officer's determination that reasonable suspicion existed was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Traffic stops have limitations. "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 460 U.S. at 500.

To determine if officers have complied with limits, courts must "take into account whether the police diligently pursue[d] their investigation." *United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). Specifically, courts should examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686.

Because there is no Kansas caselaw directly addressing this specific issue, the district court relied on Kansas precedent that generally interprets the diligence standard. The Kansas Supreme Court analyzed the findings of *Royer* and applied them in *Smith*, which the district court relied on here. The district court particularly focused on one ruling in *Smith* and quoted the case during its oral pronouncement of its decision to grant

12

the motion to suppress, stating: "To determine whether law enforcement officers have complied with the temporal limitation articulated for evaluating the propriety of a *Terry* stop, courts must 'take into account whether the police diligently pursue[d] their investigation.'" *Smith*, 286 Kan. at 410; see *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The State argues that the district court erred in relying on *Smith* because *Smith* is not factually similar to this case. The State's argument rests on the fact that the officer in *Smith* did not have reasonable suspicion to further detain the defendant after his initial stop; thus, the detention was limited to the scope of the initial seizure. This is a correct analysis of the *Smith* case generally, but the State incorrectly interprets the district court's reliance on *Smith*. The district court only relied on *Smith* to find that officers must be diligent at all times, regardless of whether reasonable suspicion to search further is present.

In ruling on the second motion to suppress, the district court acknowledged that there is only one Kansas appellate court case that discusses significant time delays and diligence by law enforcement in performing during a traffic stop seizure *after* the existence of reasonable suspicion by an officer. The district court analyzed *State v. Coleman*, 292 Kan. 813, 822-23, 257 P.3d 320 (2011), where the Kansas Supreme Court held that law enforcement had reasonable suspicion of criminal activity to justify a temporary detention to allow further investigation after the initial stop, but law enforcement had no reasonable and legal basis for detaining the defendant while officers waited for a parole officer to arrive at the scene.

In *Coleman*, the officer initially detained Coleman for a traffic stop but after conducting a driver check the officer learned Coleman was on parole. A parole officer requested the officer detain Coleman for a search. The parole officer arrived 35 minutes to an hour later and searched Coleman and the car. The search revealed that Coleman

possessed cocaine. After Coleman filed a motion to suppress and then a motion to reconsider, the district court found that the police had reasonable suspicion justifying the search. The Kansas Supreme Court agreed but found the officer detained Coleman for the "sole purpose of providing a parole officer with enough time to arrive and conduct a search under the Kansas Department of Corrections' rules." 292 Kan. at 822. The court found:

"Because, as we determined earlier, [the officer] had reasonable suspicion of criminal activity that would allow him to expand the scope of his original stop, the limitation that the Kansas Department of Corrections self-imposed would not have prevented a detention for a reasonable time for a search within the scope of the initial stop. [The officer] did not, however, conduct an immediate search; he instead detained Coleman for at least 35 minutes while he waited for backup officers and, eventually, a parole officer to arrive." 292 Kan. at 822.

The court added: "An officer may not arbitrarily detain a driver *in order to procure a drug-sniffing dog*, and an officer my not arbitrarily detain a driver in order to obtain the presence of a parole officer. [Citation omitted.]" (Emphasis added.) 292 Kan. at 823.

Here, similar to *Coleman*, Trooper Seiler had reasonable suspicion to detain Arrizabalaga very quickly after the initial stop but did nothing about it. According to his testimony, Seiler had reasonable suspicion of drug activity throughout the initial 24 minutes of the traffic stop but never attempted to call for a drug-sniffing dog during that time.

On appeal, the State argues that *Coleman* does not provide legal support for the district court's ruling because the *Coleman* court does not "address the key point of the district court's ruling here—that there is a time limit on how long an officer can hold a person for the arrival of a drug dog once reasonable suspicion of drug offenses has

14

arisen." The State concludes that because *Coleman* does not address a time limit, the district court applied an incorrect legal standard.

Much like the State's argument against *Smith*, this is a correct analysis of the case generally, but the State's interpretation of the district court's reliance on that case is once again incorrect. The district court relied on *Coleman* to emphasize the requirement of diligence by law enforcement when detaining a person after finding reasonable suspicion of illegal activity. The State's contention that the "key point" of the district court's finding, which they interpret as finding that there is a *time limit* on how long an officer can hold a person for the arrival of a drug dog, is also incorrect. In its ruling the district court did not find that the detention was illegal because it was over a specific time limit. It merely determined that the facts showed that the trooper was not "diligently and reasonably pursuing the purpose of the stop" and that "the stop was excessive in duration."

The State argues that other cases have found "such length of detentions" to be legally appropriate. First, the State argues *Sharpe* applies here because Sharpe was detained for more than 20 minutes by an officer who had reasonable suspicion that Sharpe was involved in drug trafficking. See 470 U.S. at 679. The *Sharpe* Court held that when assessing whether the length of a detention for an investigative stop is too long, "we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." 470 U.S. at 686. The Court also found that establishing a per se rule that 20-minute detentions are too long is "clearly and fundamentally at odds with our approach in this area." 470 U.S. at 686. The *Sharpe* Court found the detention to be reasonable. 470 U.S. at 687. The State uses this excerpt from the *Sharpe* decision to support its argument:

15

"Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. While it is clear that 'the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion,' we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria. [Citations omitted.]" 470 U.S. at 685.

The State appears to focus solely on the 20-minute timeframe at issue in *Sharpe* and the Court's decision to find the detention was reasonable—though the State's brief does not really develop this point. Nevertheless, the State's reliance is misguided because in *Sharpe*, and in this case, courts do not rely solely on the length of time the officers wait before they begin their search but instead specifically evaluate the diligence of law enforcement and the reasonableness of the detention.

We believe that the district court's decision here was completely in accord with the *Sharpe* Court's holding that a "bright line" rule for time is not appropriate. The district court never made a finding regarding the legal effect of the time elapsed in this case specifically and therefore this cannot be the issue on appeal. Further, the *Sharpe* Court emphasized that as a stop continues indefinitely, at some point an investigative stop can no longer be justified as such. We believe the district court here properly applied exactly the kind of analysis expected by the *Sharpe* Court and made the finding that, in the context of the facts of this case, the length of the stop was excessive. And while 48 minutes total time of detention was one of many facts presented to the district court at the second motion hearing, its ruling did not treat this particular time period as the lodestar which necessarily controlled the outcome of the second suppression motion.

The State's primary authority on appeal is *State v. Anderson*, 281 Kan. 896, 903-04, 136 P.3d 406 (2006), where the Kansas Supreme Court found officers had reasonable and articulable suspicion that Anderson was involved in drug activity to justify the continued detention of Anderson after the conclusion of the traffic stop. The State argues the *Anderson* case is factually and legal similar to this case and should be controlling.

While the cases are factually similar, the legal analysis is much different. The *Anderson* court looked at several issues, none of which was the length of the detention after finding reasonable suspicion. The *Anderson* court held that law enforcement had reasonable suspicion to detain Anderson after completing the traffic stop, but its analysis ended there. The rest of the analysis centered on the existence of probable cause to arrest for drugs, probable cause to believe Anderson was a conditional release violator, and the sufficiency of the oral arrest and detain order. 281 Kan. at 904-12. The State argues that because the Kansas Supreme Court made no finding about the length of detention in *Anderson*—which was more than 35 minutes—then the court did not find it unlawful. This is not persuasive because the length of the detention and the diligence of law enforcement in detaining Anderson for 35 minutes was not argued or at issue on appeal. Ultimately the detention and search was considered unlawful but for reasons not related to the detention for the drug dog sniff. See 281 Kan. at 904-11.

A panel of our court has previously found a defendant's detention was unreasonably prolonged while waiting for a drug dog, even though the officer had reasonable suspicion that the vehicle may have contained controlled substances. *State v. Jones*, 47 Kan. App. 2d 866, 877, 280 P.3d 824 (2012), *aff'd on other grounds* 300 Kan. 630, 333 P.3d 886 (2014).

In *Jones*, the court found that the detention was "*at least* 20 to 30 minutes" and compared this to *Coleman* where it took 35 minutes for a parole officer to arrive. 47 Kan. App. 2d at 877; see *Coleman*, 292 Kan. at 822. That said, the duration of the stop was

17

contested—as pointed out by Judge Buser in the dissent—and when *Jones* reached the Kansas Supreme Court, it did not consider this issue, deciding the case on reasonable suspicion grounds instead. *Jones*, 47 Kan. App. 2d at 878-79 (Buser, J., dissenting). Because the length of detention was disputed, the Kansas Supreme Court believed our court should not have made the finding regarding the length of time. Instead, it determined that the "lack of factual finding makes the majority's discussion suspect. The discussion was unnecessary and essentially dicta; therefore, we need not examine the merits of the majority's analysis." *Jones*, 300 Kan. at 648-49.

Thus, although *Jones* cannot be controlling, it is an example of when this court has previously found that an officer did not act diligently and reasonably when the officer detained a defendant for 20-30 minutes. The *Jones* case provides a relevant framework for analyzing this case because the panel of our court considered the issue of what constitutes diligence where reasonable suspicion existed.

As we have noted, law enforcement may detain a person after the completion of an initial traffic stop if they have reasonable suspicion that person is engaging in illegal activity, but law enforcement must continue to act diligently and detain only temporarily for no longer than necessary to effectuate the purpose of the investigatory stop. *Smith*, 286 Kan. at 410. In essence, and consistent with the State's argument to the district court that, in the wake of the U.S. Supreme Court's decision in *Rodriguez*, "the length of detention, frankly, doesn't matter," the State's brief appears to suggest that once an officer has reasonable suspicion during a traffic stop, the officer can further detain a person for as long as the officer would like. But caselaw advises otherwise. As we have observed, in *Sharpe*, the majority opinion states: "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." 470 U.S. at 685.

18

Our case stands in significant contrast to Kansas Supreme Court decisions which found an officer acted diligently when further detaining a defendant after finding the necessary reasonable suspicion of illegal activity. In a recent case, an officer initiated a traffic stop on I-70 and after speaking with the passengers and looking inside the vehicle the officer asked the driver to return with him to his patrol car. *State v. Schooler*, 308 Kan. 333, 336, 419 P.3d 1164 (2018). The officer testified that he suspected criminal activity as he left the vehicle and returned to his own. The officer texted for a drug dog about three minutes into the stop. While they were inside the car, the officer continued to act diligently. The officer questioned Schooler while reviewing Schooler's license, rental agreement, and other documents and entering Schooler's information into the officer's computer. The officer continued to act diligently while asking questions and getting criminal history information from dispatch for around 17 minutes. Around 18 minutes into the stop the officer told Schooler he was "'good to go,'" and Schooler refused to answer any questions voluntarily. 308 Kan. at 339. A drug dog arrived 11 minutes later and an eventual search found 38 pounds of marijuana. After a lengthy analysis of the officer's questioning and determining if the officer had reasonable suspicion, the Supreme Court found the officer had reasonable suspicion to detain further and that his actions were lawful. 308 Kan. at 356.

Unlike the officer in *Schooler*, Trooper Seiler did not act diligently and did not reasonably pursue the purpose of the stop after he gained reasonable suspicion that Arrizabalaga was involved in drug activity. According to his testimony, Seiler thought the interaction was suspicious the moment he made contact. Among other things, the large number of moving boxes in the van, the strong smell of cologne, and the rental agreement were suspicious facts that were all present within the first moments of Seiler's contact with Arrizabalaga. After Seiler asked Arrizabalaga to come back to his patrol car, Seiler's suspicions grew as he believed Arrizabalaga's behavior and story were "odd." Seiler did not believe his explanation of his travel plans. If Seiler was suspicious, he

19

could have attempted to dispel his suspicions or tried to locate a drug-sniffing dog immediately. The officer in *Schooler* texted for a dog three minutes into the traffic stop.

If Seiler would have attempted to locate a dog the moment he had a reasonable suspicion of drug activity, then perhaps this search would not be on appeal. But, Seiler did not attempt to dispel his suspicions until 24 minutes into the stop. Instead, he continued to ask additional questions which only made him more suspicious. Even after learning about Arrizabalaga's previous drug citations, Seiler proceeded only to issue Arrizabalaga a ticket for following too closely and tell him he was finished.

According to this testimony and the district court's findings, Seiler had all the information he needed at this point to have reasonable suspicion and request a drug dog. Still, Seiler did nothing. Finally, after 24 minutes of speaking with Arrizabalaga, Seiler asked permission to search Arrizabalaga's van. Arrizabalaga initially gave consent to search the van, but after inquiring into why Seiler wanted to search the van, Arrizabalaga revoked consent. Only after Arrizabalaga withdrew consent to search his van and the voluntary stop ended—becoming a detention—did Seiler seek to locate a dog. Moreover, Seiler told Arrizabalaga that if he could not find a dog, Arrizabalaga would be allowed to leave. This statement, in itself, shows a lack of diligence and commitment to the investigation on behalf of Seiler.

After Seiler told Arrizabalaga he would try to locate a dog, Seiler took the keys to the van from Arrizabalaga and made Arrizabalaga and his passenger wait in the van along I-70 for 24 more minutes. Seiler attempted to locate a dog, but none were available until Lieutenant Walker informed Seiler he could make the stop with his dog. This took around two minutes. For 22 minutes Seiler waited for Walker's arrival; he did not ask more questions or perform any other investigatory tasks.

If Seiler had reasonable suspicion during the initial stop, and the district court found that he did, then there were several opportunities for him to actively seek the use of a dog within the scope of the initial stop or during the time of the consensual encounter. Just like in *Schooler*, this would have been a diligent and reasonable way to pursue the purpose of the stop. Instead, Seiler waited until he had no other option but to call for a dog which unreasonably extended the stop because of his lack of diligence and effectiveness in pursuing the purpose of the investigatory stop.

Under the standard of reasonableness and diligence of law enforcement and the little precedent as for what is diligent and reasonable when detaining a person after finding reasonable suspicion of illegal activity throughout an initial traffic stop, we conclude the district court did not err when granting the motion to suppress evidence. The State's claims fail because Trooper Seiler did not diligently and reasonably pursue the purpose of the stop after finding reasonable suspicion of illegal drug activity. Seiler did not attempt to locate a dog until after the stop had been going on for 24 minutes and Arrizabalaga had withdrawn his consent to search the vehicle. It took another 24 minutes for the dog to arrive and eventually perform a search. Substantial competent evidence supports the district court's finding that Seiler failed to diligently and reasonably pursue the purpose of the stop because he did nothing about his suspicion until the second 24-minute period began.

Affirmed.

* * *

GARDNER, J., dissenting:  I respectfully dissent. Neither the facts nor the law suggests that Sergio Angel Arrizabalaga's detention for 24 minutes based on the trooper's reasonable suspicion of a crime was unreasonable.

The Fourth Amendment to the United States Constitution provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." See *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

A traffic stop is a seizure of the driver. To comply with the Fourth Amendment, the officer conducting the stop must have reasonable and articulable suspicion that the driver has committed, is committing, or is about to commit a crime. See K.S.A. 22-2402(1); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The reasonableness of an investigative detention involves a two-part test:  (1) whether the trooper's stop was justified at its inception, and (2) whether the trooper's actions during the detention were reasonably related in scope to the circumstances justifying the initial interference. *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998). For a seizure to be constitutional, the trooper must have specific and articulable facts that create a reasonable suspicion the seized individual is committing, has committed, or is about to commit a crime or traffic infraction. *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). The trooper here had that, as a traffic infraction provides an objectively valid reason to make a traffic stop. 300 Kan. at 637. The parties here do not challenge the initial stop. Nor do they challenge the scope (the intrusiveness) of the stop except for its length.

It is well established that an officer may detain a driver for questioning unrelated to the initial stop if the officer has a reasonable suspicion that illegal activity has occurred or is occurring. *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993). Reasonable suspicion is "'"a particularized and objective basis" for suspecting the person stopped of criminal activity.'" 263 Kan. at 735. "Something more than an unparticularized suspicion or hunch

must be articulated." 263 Kan. at 735. Reasonable suspicion represents a minimum level of objective justification and is a lower standard than probable cause. *City of Atwood v. Pianalto*, 301 Kan. 1008, 1011, 350 P.3d 1048 (2015). In fact, reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

The trooper here had reasonable suspicion to detain Arrizabalaga for questioning unrelated to the initial stop based on his reasonable suspicion that illegal activity was occurring under his nose. In fact, the district court held that "when the defendant withdrew his consent to search the van, there was objectively reasonable suspicion . . . to extend the detention for the dog sniff." No one challenges that conclusion. So *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), which held police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, to conduct a dog sniff, is not relevant here. Instead, the sole issue is whether, given the trooper's reasonable suspicion, the length of Arrizabalaga's detention while awaiting the drug dog's arrival was reasonable. "Whether the length of detention is reasonable is a question of law over which this court has unlimited review." *State v. Moore*, 39 Kan. App. 2d 568, 578, 181 P.3d 1258 (2008).

Kansas cases have rarely examined whether the length of a detention supported by reasonable suspicion is unreasonable. See *State v. Trammell*,  No. 106,511, 2013 WL 3155786 (Kan. App. 2013) (finding a "lengthy" detention not excessive where no evidence contradicted the trial court's finding that the police acted with diligence as the situation developed). I find no Kansas case examining the permitted length of a detention, justified by reasonable suspicion, after the conclusion of a traffic stop to get a drug dog on site. But federal cases in the Tenth Circuit have often done so. The Kansas Supreme Court routinely relies on federal cases in determining Fourth Amendment law. See, e.g., *State v. Schooler*, 308 Kan. 333, 351, 419 P.3d 1164 (2018); *State v. Glover*, 308 Kan.

590, 422 P.3d 64 (2018), *cert. granted* 139 S. Ct. 1445 (2019); *State v. Bannon*, 306 Kan. 886, 893, 398 P.3d 846 (2017). I do the same.

So how long is too long? As the United States Supreme Court has found, there is no fixed time limit in determining whether a detention is too long to be justified as an investigative stop. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (rejecting any per se rule that a 20-minute detention is too long to be justified under the *Terry* doctrine):

> "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop. But our cases impose no rigid time limitation on *Terry* stops. . . . Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.
>
> > "We sought to make this clear in *Michigan v. Summers, supra:*
> > 'If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams* [*v. Williams,* 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ].' 452 U.S., at 700, n. 12.
>
> Later, in *Place*, [462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)], we expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop:
>
> > 'We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.' 462 U.S., at 709, n. 10." *Sharpe*, 470 U.S. at 685-86.

An investigative stop must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). "The length of detention is generally measured from the time of

24

seizure to the time probable cause is established." *United States v. Moore*, 22 F.3d 241, 247 (10th Cir. 1994). Here, that length was 24 minutes. But the length of time itself is not dispositive.

The permissibility of an investigative detention normally depends on the length of the detention coupled with the diligence of the police in pursuing the investigation. See *Sharpe,* 470 U.S. at 685; *United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *United States v. Scales*, 903 F.2d 765, 769 (10th Cir. 1990). This length-plus-diligence test controls here. In this test, the officer's diligence is a weightier factor than the length of the detention.

Whether a detention was too long to be justified as an investigative stop turns not so much on the length of the detention as it does on whether the police diligently pursued means of investigation likely to confirm or dispel their suspicions quickly under the circumstances. *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323-24 (10th Cir. 1998); see *United States v. McCarthy*, 77 F.3d 522, 529-31 (1st Cir. 1996) (75-minute stop reasonable); *United States v. Vega*, 72 F.3d 507, 515-16 (7th Cir. 1995) (62-minute stop reasonable); *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (one-hour stop reasonable); *United States v. Rutherford*, 824 F.2d 831, 834-35 (10th Cir. 1987) (one-hour stop reasonable); *United States v. Acosta-Chavez*, No. 97-3288, 1998 WL 421822 (10th Cir. 1998) (unpublished opinion) (finding troopers did not act diligently in investigating their suspicion of car theft but did act diligently in investigating their suspicions that defendant was transporting drugs).

Diligence has been described as pursuing a means of investigation that will quickly confirm or dispel an officer's suspicions. See *United States v. Kopp*, 45 F.3d 1450, 1454 n.1 (10th Cir. 1995). In considering this factor, the Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop

25

as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685. The Supreme Court summarized the relevant principles in this way:

> "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable.' The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it. [Citations omitted.]" *Sharpe*, 470 U.S. at 686-87.

Yet the majority finds it sufficient that some other alternative was available—the trooper could have called for a drug dog during the traffic stop. But the controlling question is, instead, whether the trooper acted unreasonably in not doing so. *Sharpe*, 470 U.S. at 686-87. A review of relevant cases convinces me he did not. Our federal counterparts often find detentions longer than 24 minutes to be reasonable, and officers often wait until a traffic stop is concluded to call for a drug dog based on reasonable suspicion formed during the traffic stop. See, e.g., *United States v. Rosborough*, 366 F.3d 1145, 1147-51 (10th Cir. 2004) (25-minute delay reasonable); *United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997) (38-minute delay reasonable); *United States v. Kopp*, 45 F.3d 1450, 1454 (10th Cir. 1995) (30-minute delay reasonable); *United States v. Garcia*, 52 F. Supp. 2d 1239, 1252 (D. Kan. 1999) (40-minute delay reasonable); *United States v. Chavira*, No. 05-40010-01-JAR, 2005 WL 1213670, at *7 (D. Kan. 2005) (unpublished opinion), *aff'd* 467 F.3d 1286 (10th Cir. 2006) (finding detention reasonable where trooper was diligent in procuring the dog as soon as possible

under all the circumstances after driver consented, then withdrew consent to a search, then the trooper called for a drug dog 25 miles away); *United States v. Douglas*, 195 Fed. Appx. 780, 785-86 (10th Cir. 2006) (unpublished opinion) (finding a 30-minute delay to await the arrival of the drug dog reasonable). This 24-minute detention was thus not unreasonably long.

So the focus here is on the trooper's diligence. The diligence requirement had its genesis in *Place*. There, law enforcement agents stopped defendant after his arrival in an airport and seized his luggage for 90 minutes to take it to a narcotics detection dog for a "sniff test." The Court decided that an investigative seizure of personal property could be justified under the *Terry* doctrine, but that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." 462 U.S. at 709. But there, agents knew in advance what time Place was scheduled to arrive at the airport. They had ample time to arrange for additional investigation at that location and thus could have minimized the intrusion on Place's Fourth Amendment interests. 462 U.S. at 708-10. So "the rationale underlying [*Place*'s] conclusion was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes." *Sharpe*, 470 U.S. at 685. But Arrizabalaga has shown no similar lack of diligence here. Unlike in *Place*, no facts show that the trooper had any reason to know that he would need a drug dog before he stopped Arrizabalaga.

Nor did this trooper have any need to call a drug dog during the traffic stop. The trooper acted diligently during the traffic stop by taking acts related to the reason for his initial stop, which Arrizabalaga does not challenge. Those acts were directly related to his "mission," which typically includes ordinary inquiries to check the driver's license, determine whether there the driver has outstanding warrants, inspect the vehicle's registration and proof of insurance, and issue a warning or citation. See *Schooler*, 308

Kan. at 345-46. He had to be careful not to prolong the traffic stop by asking questions not directly related to that mission. *State v. Jimenez*, 308 Kan. 315, 328, 420 P.3d 464 (2018). So he was not permitted to prolong the traffic stop by asking any questions about Arrizabalaga's criminal acts even though he reasonably suspected them. *State v. Lewis*, 54 Kan. App. 2d 263, 271, 399 P.3d 250 (2017).

Even after the traffic stop concluded the trooper had no need to call a drug dog. The trooper terminated the traffic stop by giving Arrizabalaga a warning, returning his driver's license, and telling him "that's all I got for you." He then began a voluntary encounter with Arrizabalaga, who started to get out of the car—the trooper asked Arrizabalaga if he would consent to answer more questions. See *State v. Thompson*, 284 Kan. 763, 812, 166 P.3d 1015 (2007) (finding voluntary encounter where officer's conduct conveys to a reasonable person that he was free to refuse the officers' requests or otherwise terminate the encounter). Arrizabalaga did consent, and the trooper began asking him questions. Because he had consent, the trooper had no need to call a drug dog.

This diligent course of conduct was legal since the trooper had both consent and reasonable suspicion. See *Jimenez*, 308 Kan. at 331 (finding when "'a traffic stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop,'" quoting *United States v. Hill*, 852 F.3d 377, 381 [4th Cir. 2017]); *DeMarco*, 263 Kan. at 734 (holding further questioning  is permissible if [1] "'the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning,' [citation omitted], or [2] during the traffic stop the trooper gains a reasonable and articulable suspicion that the driver is engaged in illegal activity"). Arrizabalaga does not challenge the voluntariness of this encounter.

By asking Arrizabalaga questions including his travel plans and criminal history, the trooper diligently acted on his reasonable suspicion that the van was carrying illegal drugs. Asking Arrizabalaga if he would consent to answer more questions was a less intrusive means of pursuing the trooper's reasonable suspicions than making Arrizabalaga wait for a drug dog. Arrizabalaga told the trooper he had received a citation for marijuana but had never been arrested. But that statement was inconsistent with other information known to the trooper. Dispatch had told the trooper that Arrizabalaga had been charged with producing marijuana and had a felony conviction related to a stolen vehicle.

So the trooper asked Arrizabalaga if he could search his van, and Arrizabalaga consented to the search. That, too, is uncontested. Because the trooper had consent to search the van he had no need to call a drug dog. After Arrizabalaga gave consent, he and the trooper returned to the van and the trooper asked the passenger to get out. The trooper told Arrizabalaga that he had reasonable suspicion but not probable cause to search the van. Arrizabalaga asked the trooper if he had a search warrant, and the trooper responded that Arrizabalaga had consented. The trooper then told Arrizabalaga and his passenger that he was looking for large amounts of drugs and any personal use amounts would "go into the ditch." Arrizabalaga then revoked his consent to search the van. Thus ended the consensual encounter.

And the detention began. Only when Arrizabalaga withdrew his consent for the trooper to search the van did the need to call a drug dog arise. As soon as Arrizabalaga withdrew his consent to search, the trooper detained Arrizabalaga and swiftly called for a drug dog. But it was after 10 p.m., the parties were not in an urban area, and the closest trooper with a drug dog was not nearby. The closest drug dog available arrived 24 minutes after the detention began.

The majority holds that the trooper lacked diligence because he did nothing during the 24 minutes it took for the drug dog to arrive, after the traffic stop concluded. But it

fails to state what more the trooper could have legally done during that time to confirm or dispel his suspicion that Arrizabalaga was transporting drugs in the van. The trooper had no warrant or probable cause so he could not search the van or arrest Arrizabalaga. He had detained Arrizabalaga and could have interrogated him but only at the risk of being accused of a *Miranda* violation (triggered by custodial interrogation). See, e.g., *State v. Regelman*, 309 Kan. 52, 60, 430 P.3d 946 (2018) (finding detention turned into a custodial interrogation requiring *Miranda* warnings).

And the trooper could do nothing to speed the arrival of the drug dog. So he waited. That seems reasonable to me. And to others. See *United States v. $83,900.00 in U.S. Currency*, 774 F. Supp. 1305, 1318 (D. Kan. 1991) (upholding a "lengthy" investigatory detention based on reasonable suspicion because the trooper had been diligent in calling the closest canine unit, which arrived one hour later, so the trooper "had no real choice but to wait").

Slowness is not equated to lack of diligence where, as here, the delay is caused by events not attributable to the officer. See, e.g., *United States v. Shareef*, 100 F.3d 1491, 1501-02 (10th Cir.1996) (finding 30-minute detention reasonable where police "computers used to verify license information were down or slow" and the driver was not carrying a license); *United States v. Rutherford*, 824 F.2d 831, 834 (10th Cir. 1987) (finding one-hour investigative stop before arrest reasonable when nearly one-half hour was because of problems with the police computer, and troopers had received tip that implicated defendant in drug trafficking, defendant failed to stop when signaled by police, and vehicle's license plate did not match its registration).

The majority finds that the trooper should have permitted Arrizabalaga to leave. But the trooper was not legally required to do so. In fact, doing so may have been unprofessional given the trooper's reasonable suspicion that Arrizabalaga was transporting drugs in his van. Officers need not perform their duties with a blind eye.

*Jimenez*, 308 Kan. at 324. Nor should they be compelled by arbitrary time standards to ignore their reasonable suspicion of a crime committed in their presence. The trooper, having exhausted the less intrusive means of pursuing his reasonable suspicion, acted diligently by detaining Arrizabalaga for no longer than was necessary to get a drug dog to the scene to quickly confirm or dispel his reasonable suspicions. See *Sharpe*, 470 U.S. at 686-88 (upholding 20-minute detention where police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant").

The majority faults the trooper for not calling for a drug dog during the traffic stop because the trooper testified during the suppression hearing that he had formed reasonable suspicion then. But no authority suggests that the exercise of diligence requires an officer to call a drug dog as soon as the officer reasonably suspects that criminal activity is occurring, particularly where other factors, such as consent, show no need for a drug dog at the time. This is so even when the officer knows the closest dog is 78 miles away, as the Tenth Circuit held in *United States v. Martin*, 86 Fed. Appx. 364, 366 (10th Cir. 2003) (unpublished opinion). There, the officer conducted a traffic stop, returned Martin's documents, and gave him a warning. Martin then consented to answer additional questions, denied having any contraband in the vehicle, and refused to consent to a search. The officer then detained Martin for about an hour waiting for the arrival of the closest available dog handler and dog located about 78 miles away. Despite the hour wait and the 78-mile distance of the dog, the Tenth Circuit found the officer diligent and the detention reasonable:

> "The colorable issue in this appeal is the approximately one-hour delay between Mr. Martin's detention and the arrival of the dog handler and his dog. But given the abundant reasonable suspicion in this case and the diligence by both the trooper and the handler to expedite the dog sniff, the delay was reasonable and not violative of the Fourth Amendment. See *United States v. Place*, 462 U.S. 696, 709-10, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) ('[I]n assessing the effect of the length of the detention, we take into

31

account whether the police diligently pursue their investigation.'); *Williams*, 271 F.3d at 1271 (upholding detention founded upon reasonable suspicion where 15 minutes elapsed from initial stop to arrival of dog); *United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997) (upholding detention founded upon reasonable suspicion where 43 minutes elapsed from initial stop to arrival of dog); *United States v. Rutherford*, 824 F.2d 831, 833-34 (10th Cir. 1987) (upholding one-hour detention founded upon reasonable suspicion where 25-30 minute delay was caused by a computer problem)." *Martin*, 86 Fed. Appx. at 366.

The facts in *Martin*, as in other cases examining this issue, do not show that the officer did anything but sit in his or her patrol car while awaiting the dog's arrival.

By requiring the trooper to call for a drug dog the moment he first thought he had reasonable suspicion, the majority fails to recognize that the reasonable suspicion analysis requires use of an objective standard based on the totality of the circumstances, not a subjective standard based on an officer's subjective belief. *Schooler*, 308 Kan. at 351-52. So the trooper's testimony about the time at which he formed reasonable suspicion is not controlling. Nor is his statement that if he could not find a dog, he would let Arrizabalaga leave. Instead, the detaining officer's subjective beliefs and intentions are irrelevant in assessing reasonableness of the officer's actions, as the Kansas Supreme Court recently clarified in *Schooler*.

*Schooler* asked whether an officer's telling the driver he was "good to go" was relevant in deciding if the officer had an objectively reasonable suspicion that the driver was engaged in criminal activity other than the traffic infraction:

"As to that, the answer is 'no' because our inquiry is limited to whether the facts the deputy knew supported further detention. *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001) (holding officer telling motorist he was free to leave did not affect determination of whether the officer had reasonable suspicion for later detention because '[a]lthough the record indicate[d] that the officer subjectively intended that the [motorist]

32

was free to go, the relevant inquiry . . . is based on the objective facts known to the officer, not upon the officer's subjective state of mind'); see also *United States v. McHugh*, 639 F.3d 1250, 1258 (10th Cir. 2011) (rejecting argument that officer lacked reasonable suspicion to conduct *Terry* stop based on officer's admission that he had no reason at time of stop to think defendant had committed a crime, because '[t]he detaining officer's "'subjective beliefs and intentions' are, quite simply, irrelevant"' in assessing reasonableness of officer's actions); cf. *Heien v. North Carolina*, 574 U.S. __, 135 S. Ct. 530, 539, 190 L. Ed. 2d 475 (2014) (holding reasonable suspicion may be based on officer's reasonable mistake of law, but mistake must be objectively reasonable, since courts do not examine officers' subjective understanding); *Wren*, 517 U.S. at 812-13 (foreclosing 'any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved'; noting the Court had 'never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment'); *State v. Johnson*, 293 Kan. 1, 5, 259 P.3d 719 (2011) ('Seizures are generally permissible if "'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.'"')." *Schooler*, 308 Kan. at 351-52.

The reasonable suspicion analysis requires a case-by-case evaluation based on the totality of the circumstances. *State v. Lowery*, 308 Kan. 359, 370, 420 P.3d 456 (2018). So determining whether reasonable suspicion supports a detention is no simple, formulaic task.

"The totality of the circumstances standard does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances. Instead, the court determines whether all the circumstances justify the detention.

"'The relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. [Citation omitted.] The totality of the circumstances standard precludes a 'divide-and-conquer analysis' under which factors that are 'readily susceptible to an innocent explanation are entitled to "no weight." [Citation omitted.]'" *Sharp*, 305 Kan. at 1081.

33

"At the same time, while the standard does not permit officers or the courts to selectively choose the facts that would establish reasonable suspicion, it recognizes events and conditions supporting reasonable suspicion are fluid rather than fixed, and the existence of reasonable suspicion may change once new facts are observed by or become known to law enforcement. *Sharp*, 305 Kan. at 1085." *Lowery*, 308 Kan. at 366-67.

Because of the number, variety, and fluidity of factors involved in the reasonable suspicion analysis, it is not unusual for an officer to be convinced that reasonable suspicion exists, yet the court disagrees. See, e.g., *Lowery*, 308 Kan. at 370 (finding no reasonable suspicion to extend the stop when the driver was nervous, a minor discrepancy was shown between the driver's and passenger's accounts of the pair's travels, and the two were traveling in a rented car); *State v. Messner*, 55 Kan. App. 2d 630, 640, 419 P.3d 642 (2018) (finding no reasonable suspicion allowing a public safety stop to morph into an investigatory stop even though identified witness told officer that driver had appeared confused, that she believed driver was "meth'd out," and officer observed driver speaking and moving slowly); *State v. Chapman*, 23 Kan. App. 2d 999, 1011, 939 P.2d 950 (1997) (finding no reasonable suspicion to detain the defendant after the traffic stop was finished where officer noticed driver was extremely nervous, was breathing heavily, and avoided eye contact; driver was unable to name the owner of the car [allegedly his uncle]; officer noticed a hotel business card on the floorboard with a handwritten number on it; and officer noted the interior of the car had no luggage or other personal items).

On occasion, even legal experts—our court and the Kansas Supreme Court— disagree whether the facts establish reasonable suspicion. Compare *Schooler*, 308 Kan. at 356 (finding reasonable suspicion of criminal activity sufficient to justify detention of defendant for drug dog sniff ), with *State v. Schooler*, No. 116,636, 2017 WL 2212102 (Kan. App. 2017) (unpublished opinion) (finding no reasonable suspicion to extend the stop), *rev'd* 308 Kan. 333. Compare *State v. Glover*, 308 Kan. 590 (finding officer lacked reasonable suspicion for traffic stop), with *State v. Glover*, 54 Kan. App. 2d 377, 400

P.3d 182 (2017) (finding an officer had reasonable suspicion based on those same facts), *rev'd* 308 Kan. 590, *cert. granted* 139 S. Ct. 1445 (2019).

This trooper cannot be found lacking in diligence for not calling a drug dog the minute he first believed he might have reasonable suspicion given:

- the many and varying factors that contribute to that analysis;
- the ensuing legal uncertainty of that conclusion;
- the trooper's lack of need to call a dog earlier due to Arrizabalaga's consent; and
- the trooper's use of less intrusive means to pursue his suspicion before calling the dog.

The trooper was diligent in trying to get the dog as soon as possible given all the circumstances.

The majority engages in prohibited "post hoc evaluation of police conduct," imagining "some alternative means by which the objectives of the police might have been accomplished." *Sharpe*, 470 U.S. at 686-87. Its decision effectively establishes a per se rule that a 24-minute detention to await the arrival of a drug dog is too long to be justified under the *Terry* doctrine. As in *Sharpe*, 470 U.S. at 684-86, that result is "clearly and fundamentally at odds" with the correct Fourth Amendment analysis. Because Arrizabalaga's 24-minute detention was reasonable given the circumstances, I would reverse the district court's suppression of evidence.